# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY;
ENVIRONMENTAL DEFENSE FUND; and
SIERRA CLUB,

*Petitioners*,

v.

NATIONAL HIGHWAY TRAFFIC
SAFETY ADMINISTRATION; PETER
SIMSHAUSER, in his official capacity as
Chief Counsel and Acting Administrator of the
National Highway Traffic Safety Administra-
tion; and SEAN DUFFY, in his official capac-
ity as Secretary of the United States
Department of Transportation,

*Respondents*.

Case No. 25-1642

## CORRECTED MOTION TO INTERVENE AS RESPONDENTS[1]

Movants American Free Enterprise Chamber of Commerce ("AmFree"), National Corn Growers Association, Kentucky Corn Growers Association, Kansas Corn Growers Association, Illinois Corn Growers Association, Iowa Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, South Dakota Corn Growers Association, and Tennessee Corn Growers Association (collectively, "Corn Growers"), and the States of Nebraska, Kentucky, Iowa, and West Virginia (collectively, "States") file this motion to intervene as respondents in the consolidated cases pursuant to Federal Rule of Appellate Procedure 15(d).[2]

## INTRODUCTION

Petitioners challenge an Interpretive Rule issued by the National Highway Traffic and Safety Administration ("NHTSA") entitled *Resetting the Corporate Average Fuel Economy Program*, 90 Fed. Reg. 24,518 (Jun. 11, 2025) ("Interpretive Rule"). The rule sets forth a revised view of NHTSA's statutory authority to set

---

[1] Petitioners take no position on this motion. Respondents do not oppose it.

[2] Rule 15(d)'s intervention procedures apply "[u]nless a statute provides another method." Fed. R. App. P. 15(d). Because the statute that Petitioners seek review under does not provide another method for intervention, *see* 49 U.S.C. § 32909; Pet. for Rev. at 1, Rule 15(d) applies here.

fuel economy standards for new automobiles (known as "Corporate Average Fuel Economy," or "CAFE," standards) and fuel-efficiency standards and compliance protocols for new "commercial medium- and heavy-duty on-highway vehicles and work trucks" (hereinafter, "heavy-duty vehicles"), 49 U.S.C. § 32902. Based on its revised view, NHTSA concludes that it lacks authority to enforce the current CAFE standards for new automobiles and fuel-efficiency standards for heavy-duty vehicles, including the standards for heavy-duty pickups and vans. 90 Fed. Reg. at 24,519–25. In the Interpretive Rule, NHTSA further commits to a new rulemaking to replace the current standards and explains that, in the interim, "NHTSA will exercise its enforcement authority with regard to all existing CAFE and [heavy-duty] standards in accordance with the interpretation set forth in this rule." 90 Fed. Reg. at 24,526.

The current fuel-efficiency standards are engineered to increase the share of new electric vehicles in most vehicle categories and decrease the share of new inter-nal-combustion vehicles. As a result, they also drive up the cost of internal-combus-tion vehicles for American consumers, as manufacturers attempt to recover the losses they incur by producing more electric vehicles than the market demands. *See* Tom Krisher, *Ford says EV unit losing billions, should be seen as startup*, Associated Press (Mar. 23, 2023), https://perma.cc/P6HL-V7YL. Fuel-efficiency standards are also intended to decrease the amount of gasoline and diesel fuel sold. *Corporate*

*Average Fuel Economy Standards for Passenger Cars and Light Trucks for Model Years 2027 and Beyond and Fuel Efficiency Standards for Heavy-Duty Pickup Trucks and Vans for Model Years 2030 and Beyond*, 89 Fed. Reg. 52,540, 52,545 (June 24, 2024). Indeed, that is the "*whole point*" of NHTSA's fuel-efficiency standards. *Tex. Corn Producers v. EPA*, 141 F.4th 687, 700 (5th Cir. 2025).[3]

Movant AmFree is a membership organization that represents hard-working entrepreneurs and businesses across all sectors and all states. AmFree's members are vitally interested in maintaining the free, fair, and open American markets that have driven progress and enabled prosperity more effectively than all other economic systems combined. AmFree serves its members by fighting against burdensome regulations and counterproductive policies that threaten these markets, including energy markets. *See* Ex. A at ¶ 4 (Decl. of Gentry Collins on behalf of AmFree). AmFree's members include companies that own, operate, and lease internal-combustion vehicles of all classes, many of which are subject to the current fuel-efficiency

---

[3] After the petitions were filed, the President signed legislation setting CAFE civil penalties to zero. H.R. 1 § 40006, 119th Cong. (2025) *amending* 49 U.S.C. § 32912. That legislation, however, does not affect the heavy-duty fuel-efficiency standards, for which the civil penalty is independently set by NHTSA regulation at "not more than $51,668 per vehicle or engine" for each violation, 49 C.F.R. § 578.6(i), purportedly pursuant to 49 U.S.C. § 32902(k). In any event, to the extent Petitioners still have a live interest in the CAFE portion of the Interpretive Rule, Intervenors have an interest in that portion, too.

standards. *Id.* at ¶¶ 12–14. These members have largely concluded that electric vehicles are not a commercially feasible option for their businesses, and so they intend to continue operating internal-combustion vehicles. To the extent petitioners have a live interest in NHTSA's enforcement of fuel-efficiency standards, therefore, AmFree has at least an equal and opposite interest in defending the Interpretive Rule. *Id.*

The Corn Growers Movants are membership organizations that represent corn farmers across the country. A primary use of domestically grown corn is ethanol, a renewable fuel that is the second largest component, by volume, in gasoline. *See, e.g.*, Ex. B at ¶¶ 4–6, 16 (Decl. of Lane Howard on behalf of National Corn Growers Association). When demand for ethanol decreases, so does the price that Corn Growers' members can obtain for their corn crops. *Id.* ¶¶ 14–16. The Corn Growers, as well as AmFree members who produce ethanol, thus have a strong interest in a robust and thriving national market for internal-combustion vehicles. *See, e.g.*, Ex. A at ¶¶ 15–17; Ex. B at ¶¶ 4–16; Ex. C at ¶¶ 14–18 (Decl. of Adam Andrews on behalf of Kentucky Corn Growers Association); Ex. D at ¶¶ 14–18 (Decl. of Rodney Weinzierl on behalf of Illinois Corn Growers Association); Ex. E at ¶¶ 14–18 (Decl. of Josh Roe on behalf of Kansas Corn Growers Association). To the extent Petitioners have a live interest in NHTSA's enforcement of fuel-efficiency standards, AmFree and

the Corn Growers therefore also have at least an equal and opposite interest in defending the Interpretive Rule. *See id.*

The State Movants purchase and use internal-combustion vehicles to provide state services like plowing snow and repairing roads. Many of the States prefer to buy only internal-combustion heavy-duty vehicles. The States have an interest in preserving their ability to choose internal-combustion vehicles and preventing increases in procurement costs for those vehicles. In addition to those consumer harms, the States also have an interest in maintaining their electric grids, decreasing the need for road maintenance, and preserving state fuel tax revenues. All of those interests are adversely affected by the increased share of new electric vehicles caused by fuel-efficiency standards because electric vehicles add demand to the grid, are heavier, and do not pay fuel taxes. To the extent Petitioners have a live interest in NHTSA's enforcement of fuel-efficiency standards, the Movant States also have an interest in defending the Interpretive Rule from challenge.

Because of these interests, Movants AmFree, the Corn Growers, and the States are also petitioners in a pending challenge in the Court of Appeals for the Sixth Circuit to the model year 2027 to 2031 CAFE standards and the heavy-duty pickup and van fuel-efficiency standards for model year 2030 and later years, which the Interpretive Rule implicates. *MCP No. 189 Corp. Avg. Fuel Econ.*, No. 24-7001 (6th Cir.

Nov. 20, 2024).[4] As explained in Part I.B. below, Movants filed that Sixth Circuit challenge before the Interpretive Rule was issued and their briefing advances some statutory interpretations that the Interpretive Rule adopts, but also others that the Interpretive Rule does not adopt.[5] This Court's review of the Interpretive Rule may well address some of the arguments that Movants have already put forward before the Sixth Circuit, and this Court's decision will affect Movants' likelihood of success in that first-filed challenge. Movants therefore have an interest in participating in these consolidated cases to protect the legal positions and arguments they are advocating in the Sixth Circuit. Intervention is therefore proper.

---

[4] The consolidated Sixth Circuit cases include, as relevant, No. 24-3606 (AmFree petitioner), Nos. 24-3539 and 24-3572 (Kentucky, Michigan, and Tennessee Corn Growers Associations petitioners), No. 24-3698 (Illinois, Iowa, Kansas, Missouri, Nebraska, Ohio, and South Dakota Corn Growers Associations petitioners), and No. 24-3560 (States of Kentucky, Nebraska, Iowa, and West Virginia petitioners). The Illinois, Kansas, Kentucky, and Missouri Corn Growers also intervened in a D.C. Circuit challenge to the model year 2024 to 2026 CAFE standards, which has been held in abeyance. *NRDC v. NHTSA*, No. 22-1080 (D.C. Cir. Nov. 17, 2022).

[5] The Interpretive Rule does not adopt Movants' arguments that the heavy-duty standards are unlawful because (i) 42 U.S.C. § 32902(k)(2) prohibits the standards' consideration of electric vehicles, which do not use fuel, when calculating achievable "fuel efficiency" standards, (ii) Section 32902(k)(2) prohibits the standards' assumption that electric vehicles use no energy, and (iii) the standards do not provide the "3 full model years of regulatory stability" that Section 32902(k)(3)(B) requires. *MCP No. 189*, No. 24-7001, Dkt. No. 102-1, at 22–23, 63–82.

## BACKGROUND

The State and City Petitioners filed a petition for review of NHTSA's Inter-pretive Rule in this Court on June 20, 2025 and the Nongovernmental Petitioners' case was consolidated with this one on July 3.[6] The Interpretive Rule sets forth NHTSA's revised interpretation of its authority to regulate new motor vehicle fuel efficiency under the Energy Policy and Conservation Act (EPCA) and Energy Independence and Security Act (EISA), *codified at* 49 U.S.C. § 32902. 90 Fed. Reg. at 24,519–25. With regard to CAFE, the Interpretive Rule reads 42 U.S.C. § 32902(h) to prohibit NHTSA from considering (i) the efficiency of battery-electric vehicles, (ii) the electric-operation of plug-in hybrids, and (iii) the availability and trading of credits "for any purpose and at any point in the process of setting fuel economy standards." 90 Fed. Reg. at 24,519. This is a reversal from the agency's approach when setting model year 2024 through model year 2031 CAFE standards, in which NHTSA unlawfully considered the efficiency of electric automobiles, resulting in CAFE standards that effectively compelled manufacturers to produce an increasing

---

[6] Nongovernmental Petitioners filed a petition for review on June 20, 2025, in the D.C. Circuit. On July 3, 2025, the United States Panel on Multidistrict Litigation ordered the cases consolidated in this Court. *MCP No. 197*, Dkt. No. 3 (July 3, 2025). The State and City Petitioners' case is No. 25-1595, the Nongovernment Petitioners' case is No. 25-1642, and No. 25-8019 is the consolidated case that includes all petitioners. Movants seek to intervene in all of these cases.

percentage of electric automobiles. 89 Fed. Reg. at 52,549, 52,583; *Corporate Average Fuel Economy Standards for Model Years 2024–2026 Passenger Cars and Light Trucks*, 87 Fed. Reg. 25,710, 25,780, 25,899, 25,970 (May 2, 2022).

The Interpretive Rule also adopts a revised interpretation of NHTSA's authority to set heavy-duty fuel-efficiency standards. Specifically, the Interpretive Rule concludes that NHTSA (i) failed to consider all factors required by 42 U.S.C. § 32902(f) and (ii) lacks statutory authority to impose civil penalties or create a credit trading program for heavy-duty vehicles, as NHTSA did when setting prior standards. 90 Fed. Reg. at 24,524–25. As a result, NHTSA concludes that the current heavy-duty standards exceed NHTSA's statutory authority under EISA. *Id.* at 24,524–25.

The Interpretive Rule commits NHTSA to a new "rulemaking process for the establishment of replacement standards" and announces that, in the interim, "NHTSA will exercise its enforcement authority with regard to all existing CAFE and [heavy-duty] standards in accordance with the interpretation set forth in this" Interpretive Rule. 90 Fed. Reg. at 24,526.

## ARGUMENT

This Court should grant Movants' motion to intervene as of right or, in the alternative, grant Movants permissive intervention.

Federal Rule of Appellate Procedure 15(d) expressly permits intervention in proceedings for direct review of agency action in the courts of appeals. "[T]he policies underlying intervention" in district court are generally "applicable in appellate courts." *Int'l Union v. Scofield,* 382 U.S. 205, 217 n.10 (1965); *see also Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 276–77 (2022). Accordingly, "intervention in the court of appeals is governed by the same standards as in the district court," i.e. Federal Rule of Civil Procedure 24 ("Rule 24"). *Mass. Sch. of L. at Andover, Inc. v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997); *E. Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1001 (9th Cir. 2024) (applying Rule 24 to appellate intervention).

Rule 24 entitles a party to intervene as of right when it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Rule 24 also gives courts discretion to grant intervention to a party not entitled to intervene as of right who files a "timely motion," and "has a claim or defense that shares with the main action a common question of law or fact," so long as intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), (b)(3). The "court

is required to accept as true the non-conclusory allegations made in support of an intervention motion." *B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.*, 440 F.3d 541, 543 (1st Cir. 2006) (quoting in parenthetical *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819–20 (9th Cir.2001)).

## I.    Movants Are Entitled to Intervene Under Rule 24(a)(2)

To intervene as of right, a movant "must establish (i) the timeliness of its motion to intervene; (ii) the existence of an interest relating to the property or transaction that forms the basis of the pending action; (iii) a realistic threat that the disposition of the action will impede its ability to protect that interest; and (iv) the lack of adequate representation of its position by any existing party." *R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 7 (1st Cir. 2009). Applying "this framework … requires a holistic, rather than reductionist, approach. The inherent imprecision of Rule 24(a)(2)'s individual elements dictates that they be read not discretely, but together, and always in keeping with a commonsense view of the overall litigation." *Pub. Serv. Co. of N.H. v. Patch*, 136 F.3d 197, 204 (1st Cir. 1998) (cleaned up). Movants easily meet these requirements.[7]

---

[7] Intervenors seeking to join existing parties without adding additional claims are not required to show Article III standing. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020).

## A. This Motion Is Timely

This motion is timely because it was filed within the 30 days provided by rule. Fed. R. App. P. 15(d) (motion to intervene must be "filed within 30 days after the petition for review is filed"). Because Movants filed before the rule-imposed deadline and the suit has not "progressed beyond the initial stages," *Geiger v. Foley Hoag LLP Ret. Plan,* 521 F.3d 60, 64 (1st Cir.2008), there is no credible argument that the motion is untimely.

## B. Movants Have Substantial Interests in These Cases

Although "[t]here is no precise and authoritative definition of the interest required to sustain a right to intervene under Rule 24(a)(2)," *Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 638 (1st Cir. 1989) (citation omitted), courts must assess a movant's claimed interest "in keeping with the pragmatic cast of Rule 24(a)(2)." *Patch*, 136 F.3d at 206. Moreover, "[a]lthough the … 'interest' required under Rule 24(a)" is "not identical" to Article III standing, a party who has "a sufficient stake in the outcome to support standing under Article III" likely has a sufficient interest to intervene as of right. *Daggett v. Comm'n on Governmental Ethics & Election Pracs.*, 172 F.3d 104, 110 (1st Cir. 1999); *see also Cotter v. Mass. Ass'n of Minority L. Enf't Officers*, 219 F.3d 31, 34 (1st Cir. 2000). Movants' practical economic and legal

interests in ensuring the Interpretive Rule remains in effect easily justify their intervention as of right in this action.

First, Movants have an interest in shielding their members from the economic harm they would suffer if the Interpretive Rule is vacated and NHTSA is required to enforce the unlawful existing standards. "Potential economic harm to a would-be intervenor is a factor that warrants serious consideration in the interest inquiry." *Patch*, 136 F.3d at 205 (citations omitted). Here, fuel-efficiency standards that are the subject of the Interpretive Rule will inflict economic harm on AmFree members by increasing the cost and difficulty of procuring and maintaining the internal-combustion vehicles they use, lease, or sell to make a living. *See* Introduction, *supra*. The standards also cause economic harm to AmFree's ethanol-producer members and to the Corn Growers' farmer members because they reduce gasoline consumption, which in turn reduces demand for ethanol and decreases the price of corn. *See id.* Just one month ago, the Supreme Court held that fuel producers have Article III standing to challenge administrative policies that reduce fuel consumption. *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2134–35 (2025). AmFree and the Corn Growers, whose members are likewise in the motor fuel supply chain, thus also have a sufficient interest under Rule 24(a)(2) to intervene in a suit that threatens to reduce fuel demand. *See Daggett*, 172 F.3d at 110; *see also Cotter*, 219 F.3d at 34. In sum,

Movants "belong to a small group, quite distinct from the ordinary run of citizens, who could expect to receive" an economic benefit "if the [challenged action] is upheld but not otherwise," and so have an interest in the litigation sufficient to intervene as of right. *Daggett*, 172 F.3d at 110.

This potential economic harm is the kind of harm this Court has previously held was "sufficient … to intervene as of right." *Conserv. Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 40 (1st Cir. 1992). For example, in *Mosbacher*, a proposed consent decree would have forced regulators to require that members of fishing groups—who were not parties to the decree—make expensive changes to their fishing techniques. *Id.* at 43. This Court explained that "[t]he circumstances are such that if the [Plaintiff] prevails, by its own admission, the fishing groups' economic interests will be substantially affected," and that those economic "interests are not speculative," even though "the explicit terms of the consent decree … merely begin the process through which" the harm would occur. *Id.* Likewise here, to the extent Petitioners have a live interest in compelling NHTSA to enforce fuel-efficiency standards, Movants' members' "economic interests will be substantially affected" and that injury is "not speculative." *Id.*; *see Diamond Alt. Energy*, 145 S. Ct. at 2134–35.

Without the Interpretive Rule, the States, too would face consumer harms. The States own and purchase internal-combustion heavy-duty vehicles. Several of the States plan to buy only internal-combustion trucks. The decrease in internal-combustion vehicles that would occur if the Interpretative Rule were vacated would limit the States' choice as consumers. This "lost opportunity to purchase vehicles of choice is sufficiently personal and concrete to satisfy Article III requirements." *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 113 (D.C. Cir. 1990); *see Ctr. for Auto Safety v. NHTSA*, 793 F.2d 1322, 1324 (D.C. Cir. 1986). The decrease in internal-combustion vehicles would also increase costs to procure and maintain the States' vehicles needed for, among other things, plowing snow and fixing roads. Increased prices for goods and services are "certainly an injury-in-fact," and so likewise satisfy Rule 24(a)(2)'s interest requirement. *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 383 (D.C. Cir. 2020).

Furthermore, if the challenged Interpretive Rule were vacated and NHTSA could enforce the unlawful standards, the States will suffer other harms as sovereigns. Fewer vehicles powered by gasoline, diesel, and biofuels on the States' roads will lower the States' fuel tax revenues. *See Wyoming v. Oklahoma*, 502 U.S. 437, 448–51 (1992). More vehicles powered by electricity will force the States to spend billions of dollars to build out their electric grids. And electric vehicles, which are

considerably heavier than their internal-combustion counterparts, cause greater wear and tear to the States' roads increasing their rate of deterioration. That would force the States to spend more to maintain their roads.

Second, Movants' pending Sixth Circuit case gives them a legal "interest relating to the … transaction that is the subject of" this action. Fed. R. Civ. P. 24(a)(2). The "transaction" is NHTSA's Interpretive Rule, which adopts the interpretation of NHTSA's statutory authority to set CAFE standards that Movants advance in their pending Sixth Circuit action. Movants' legal interest in preserving that relief—and ultimately successfully prevailing in full in their Sixth Circuit action—satisfies Rule 24(a)(2)'s interest requirement. *Cf. Maine v. U.S. Fish and Wildlife Serv.*, 262 F.3d 13, 14 (1st Cir. 2001) (suggesting Rule 24(a)(2)'s interest requirement is "met where the litigation challenges governmental action which the government defends and the proposed intervenor had earlier sued the government trying to bring about a similar action").

### C. These Cases Threaten to Impede Movants' Ability to Protect Their Interests

To satisfy the third requirement for intervention as of right, a party need only show that "the disposition of the action threatens to create a practical impediment to its ability to protects its interest." *Kellogg USA, Inc.*, 440 F.3d at 544–45 (1st Cir. 2006) (citation omitted). Here, Movants satisfy the third requirement for the same

reasons they satisfy the second. *See id.* at 545 (the "same rationale" that showed a sufficient interest also "satisfies the requirement that [movant]'s interests, as a practical matter, may be impaired by this litigation").

First, if petitioners succeed in these cases, Movants' ability to shield their members and taxpayers from economic harm caused by the unlawful fuel-efficiency standards would be impaired. The Interpretive Rule commits NHTSA to non-enforcement. 90 Fed. Reg. at 24,526 ("NHTSA will exercise its enforcement authority with regard to all existing CAFE and [heavy-duty] standards in accordance with the interpretation set forth in this rule."). As a result, with the Interpretive Rule in effect any potential harm from the fuel-efficiency standards is mitigated: vehicle manufacturers can produce the internal-combustion vehicles that the market demands—and which AmFree's members and the States want to purchase—preserving vehicle choice and reducing vehicle upfront costs. While the Interpretive Rule is in effect, AmFree's and the Corn Growers' members also avoid the destruction of gasoline demand that would otherwise result from the fuel-efficiency standards. Less gasoline demand would also decrease States' fuel tax revenues. Unique to the States, NHTSA's present non-enforcement of the CAFE standards prevents accelerated road deterioration (and its attendant costs) and strain on the States' electric grids. Movants therefore have an interest in defending the Interpretive Rule.

Second, the consolidated cases threaten to impair Movants' interest in ensuring that NHTSA continues to adhere to the interpretation of 42 U.S.C. § 32902(h) that Movants advanced and continue to advocate in their pending Sixth Circuit action. Were petitioners to prevail in this action, precedent from this Court could be persuasive—and possibly preclusive with respect to NHTSA—in Movants' Sixth Circuit suit. The only way for Movants to protect their interests in ensuring that NHTSA adheres to a correct interpretation of § 32902(h) is to intervene in this action.

### D. Movants' Interests May Not Be Adequately Represented

To satisfy the final requirement for intervention as of right, an "intervenor need only show that representation *may* be inadequate, not that it is inadequate." *Mosbacher*, 966 F.2d at 44 (emphasis added, citing *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n. 10 (1972)). Although that standard "is ratcheted upward" when a party seeks to join a government body in defending government action, *Patch*, 136 F.3d at 207 (cleaned up), it is enough for a party "to demonstrate that its interests are sufficiently different in kind or degree from those of the named party." *Kellogg USA, Inc.*, 440 F.3d at 546 (citation omitted).

Movants satisfy this final requirement, at least because their adversity to Respondents in their pending Sixth Circuit action presents a quintessential conflict of

interest that may prevent Respondents from adequately representing Movants' interests here. Adversity in other litigation is a recognized ground for inadequacy of representation under Rule 24(a)(2). *McQuilken v. A & R Dev. Corp.*, 510 F. Supp. 797, 803 (E.D. Pa. 1981); *In re Parr*, 17 B.R. 801, 805 (Bankr. E.D.N.Y. 1982); *Hartford Acc. & Indem. Co. v. Crider*, 58 F.R.D. 15, 19 (N.D. Ill. 1973). Although Movants seek to defend the Interpretive Rule alongside Respondents in this action, the Respondents remain directly adverse to Movants in their pending Sixth Circuit challenge. *See MCP No. 189*, No. 24-7001 (6th Cir. Nov. 20, 2024). That case has been held in abeyance, but Respondents filed a responsive brief opposing Movants' position and have not disavowed that brief before the court. *See id.* at Dkt. No. 119. That conflict of interest raises the possibility that Respondents cannot adequately represent Movants' interests in this lawsuit. *Cf.* MODEL RULES OF PRO. CONDUCT R. 1.7(A) (AM. BAR ASS'N 2025) ("A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client").

Divergence of interests between Movants and Respondents throughout the potentially lengthy course of litigation is also possible. Although Movants and Respondents presently share a common interest in defending the Interpretive Rule, NHTSA has a history of reversing its position on fuel-efficiency standards. For example, NHTSA has flip-flopped with every change in presidential administration

since 2012 on whether it may consider plug-in hybrids when calculating CAFE standards. *Compare 2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards*, 77 Fed. Reg. 62,624, 62,670 (Oct. 15, 2012) ("NHTSA interprets 32902(h)" to allow consideration of "the calculated fuel economy of plug-in hybrid electric vehicles for purposes of determining the maximum feasible standards in MYs 2020 and beyond."), *with The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks*, 85 Fed. Reg. 24,174, 24,216 (Apr. 30, 2020) ("NHTSA … cannot consider the use of alternative fuels by dual-fueled vehicles (such as plug-in hybrid electric vehicles)"), *and* 87 Fed. Reg. at 25,811 ("Plug-in hybrid technologies … are assigned in the baseline fleet."), *and* 90 Fed. Reg. at 24,523 ("NHTSA may not consider the fuel economy of dual-fueled automobiles operated by electricity or other fuel in any respect and at any point in the process of setting fuel economy standards.").

Agencies also commonly dismiss pending appeals after administration changes. *See, e.g.*, *Mass. Fair Hous. Ctr. v. HUD*, No. 21-1003 (1st Cir.) (dismissed Feb. 18, 2021); *California v. HHS*, No. 20-16802 (9th Cir.) (dismissed Sept. 29, 2021); *Mayorkas v. Cook Cnty.*, No. 20-450 (U.S.) (dismissed Mar. 9, 2021); *Kentucky v. FHWA*, No. 24-5532 (6th Cir.) (dismissed Feb. 3, 2025).

This history makes it far more than theoretical that Respondents may reverse position during the course of this litigation—for example, after a change in presidential administration. Indeed, it is common for lawsuits filed against agencies in the first year of a presidential term to outlast the administration. Examples of cases filed at the beginning of the Biden administration that are still pending include: *Am. Petroleum Inst. v. EPA*, No. 21-1046 (D.C. Cir.) (filed Feb. 1, 2021); *Magellan Midstream Partners, L.P. v. EPA*, No. 21-1044 (D.C. Cir.) (filed Feb. 1, 2021); and *New York v. EPA*, No. 21-1076 (D.C. Cir.) (filed Mar. 1, 2021). Intervention in this case is thus necessary to ensure that Movants' interests are protected through the full course of the litigation.

## II. Alternatively, This Court Should Grant Permissive Intervention

Even if Movants did not meet the standard for intervention as of right, this Court should grant them permissive intervention because they "ha[ve] a claim or defense that shares with the main action a common question of law or fact," and their intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), (b)(3). Courts have more discretion to grant permissive intervention than to grant intervention as of right. *R & G Mortg. Corp.*, 584 F.3d at 8.

## A. Movants' Defenses Share a Common Question of Law

The common-question requirement is a "low threshold." *Mass. Food Ass'n v. Mass. Alcoholic Beverages Control Comm'n*, 197 F.3d 560, 568 (1st Cir. 1999). In fact, it is so low that "a common interest between parties is sufficient to satisfy the requirement of a common question of law or fact." *Maxum Indem. Co. v. Thermax, Inc.*, No. CV 19-10583-NMG, 2020 WL 9743896, at *13 (D. Mass. Jan. 7, 2020) (cleaned up). Movants thus easily satisfy the common-question requirement because they share with Respondents "a common interest" in having the Interpretive Rule, and the statutory interpretations it advances, upheld as lawful. *Id.*; *see* Part I.C, *supra*.

Moreover, because Movants intend to defend the Interpretive Rule, their defenses indisputably share a common question of law with the main action. If admitted as Intervenor-Respondents, Movants would argue, in part, that the Interpretive Rule correctly interprets 42 U.S.C. § 32902(h) to prohibit CAFE standards that consider (i) the "fuel economy" of electric vehicles, (ii) the electric-operation of plug-in hybrids, or (iii) the availability and trading of credits. Indeed, Movants have already defended this interpretation of § 32902(h) at length in their brief in their pending Sixth Circuit action. *See MCP No. 189*, No. 24-7001, Dkt No. 102-1 at 27–43. This question of law is central to the main action, as it is the very justification that the

Interpretive Rule, itself, advances for its conclusions regarding NHTSA's statutory authority to set CAFE standards. 90 Fed. Reg. at 24,519.

### B. Intervention Would Not Prejudice the Existing Parties

Finally, granting permissive intervention would not prejudice the existing parties. Movants timely sought intervention within the 30 days allotted, *see* Part I.A, *supra*; Fed. R. App. P. 15(d), and before any dispositive motions have been filed, so intervention will not cause undue delay or disruption. *See, e.g.*, *Travelers Indem. Co. v. Bastianelli*, 250 F.R.D. 82, 85 (D. Mass. Apr. 8, 2008) (finding no prejudice to existing parties, in part because this case had not moved beyond initial dispositive motions); *Varsity Wireless, LLC v. Town of Boxford*, No. CV 15-11833-MLW, 2016 WL 11004357, at *4 (D. Mass. Sept. 9, 2016) (finding no prejudice to existing parties because "the instant case is in the very early stages"). Movants are prepared to meet all the filing deadlines applicable to named Respondents and so will not delay litigation. Furthermore, all parties will have a full opportunity to respond to any of Movants' motions or pleadings. *See Pike ex rel. Est. of Pike v. Sebelius*, No. CA 13-392 S, 2015 WL 4394759, at *6 (D.R.I. July 16, 2015) (finding no prejudice from post-hearing memorandum when plaintiff "had a full opportunity to respond").

## CONCLUSION

For these reasons, the Court should grant Movants' motion to intervene as of right or, in the alternative, grant Movants permissive intervention.

Dated: July 25, 2025                          Respectfully submitted,

/s/ James R. Conde                            MICHAEL T. HILGERS
Michael Buschbacher                           Attorney General of Nebraska
James R. Conde
James R. Wedeking                             /s/ Cody S. Barnett
Laura B. Ruppalt                              Cody S. Barnett
Nicholas A. Cordova                           *Solicitor General*
Boyden Gray PLLC                              Nebraska Department of Justice
800 Connecticut Ave NW, #900                  1445 K Street, Room 2115
Washington, DC 20006                          Lincoln, NE 68508
(202) 955-0620                                (402) 471-2683
jconde@boydengray.com                         cody.barnett@nebraska.gov

*Counsel for Private-Party Movants*           *Counsel for State of Nebraska*

RUSSELL COLEMAN                               BRENNA BIRD
Attorney General of Kentucky                  Attorney General of Iowa

/s Matthew F. Kuhn                            /s/ Eric H. Wessan
Matthew F. Kuhn                               Eric H. Wessan
Solicitor General                            Solicitor General
Office of Kentucky Attorney General          1305 E. Walnut Street
700 Capital Avenue, Suite 118                Des Moines, Iowa 50319
Frankfort, Kentucky 40601                     (515) 823-9117
Matt.Kuhn@ky.gov                              (515) 281-4209 (fax)
(502) 696-5300                                eric.wessan@ag.iowa.gov

*Counsel for the Commonwealth of Kentucky*    *Counsel for State of Iowa*

JOHN B. MCCUSKEY
Attorney General
of West Virginia

/s/ Michael R. Williams
Michael R. Williams
Solicitor General
Office of the Attorney General
of West Virginia
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvag.gov

*Counsel for State of West Virginia*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Movant American Free Enterprise Chamber of Commerce states that it is a membership organization with no parent corporations or stock. Movants the National Corn Growers Association, Kentucky Corn Growers Association, Illinois Corn Growers Association, Iowa Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, South Dakota Corn Growers Association, and Tennessee Corn Growers Association state that they are nonprofit organizations with no parent corporations or stock.

Dated: July 25, 2025

Respectfully submitted

/s/ James R. Conde
JAMES R. CONDE

*Counsel for* Movants American Free Enterprise Chamber of Commerce, National Corn Growers Association, Kentucky Corn Growers Association, Illinois Corn Growers Association, Iowa Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Nebraska Corn Growers Association, South Dakota Corn Growers Association, and Tennessee Corn Growers Association

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Motion to Intervene complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2) because it contains 5,124 words. I further certify that this Motion complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2024 in Equity A 14-point font.

Dated: July 25, 2025

Respectfully submitted

/s/ James R. Conde
JAMES R. CONDE

**CERTIFICATE OF SERVICE**

I hereby certify that that on July 25, 2025, the foregoing was filed electronically with the Court's electronic filing system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Dated: July 25, 2025

Respectfully submitted,

/s/ James R. Conde
James R. Conde

*Counsel for Private-Party Movants*